We'll move to our second case this morning, Peter Nelson v. Town of Paris. Ms. Nicholas, good morning. Good morning. May it please the Court. This case concerns an ordinance enacted by the Town of Paris, Wisconsin, restricting where persons with past convictions for certain sex offenses are permitted to reside. This ordinance is unlike anything that has been upheld by this Court or any other Court. It prohibits persons with certain past convictions from living within 6,500 feet of a variety of protected locations, which includes not only the traditional child-centric locations like daycares, schools, and playgrounds, but also encompasses recreational trails, parks, and places of worship. And in addition, it prohibits registrants from residing within 6,500 feet of one another, a restriction that has never been considered by any Court. Ms. Nicholas, is it allowable for a Court that is balancing excessiveness to consider housing possibilities just outside the boundaries of town? For instance, okay, a former offender could live 50 feet from a daycare if, for example, the offender lived on the Bristol side of the town line and the daycare was just across the line on the Paris side. Is that right?  I don't know whether that's something that the town of Paris seeks to do. However, I would say more broadly, it does not make sense to look to the availability of other housing options elsewhere. Because these communities that are enacting residency restriction laws are responsive to one another. And so if an ordinance like the one that the town of Paris has adopted is upheld, that will, of course, lead to other municipalities that do not want to become a haven for individual sex-offense convictions who have been banned from their homes in Paris to move to the neighboring municipalities. So I think that where the district court erred was finding that it was bound by this Court's previous decisions in cases like Vasquez and Hope to find that this ordinance was not excessive under the ex post facto clause. So, Ms. Nicholas, what I struggle with in these cases, you know, in comparing them to Vasquez and Hope and whatnot, is trying to come up with some sort of either rule or limiting principle that we can provide to towns and other municipalities out there as to what is allowable and not allowable. And so here it appears that if you take, I'm going to call them subsection A, which is the one that deals with proximity to other sex offenders, and subsection B, which is proximity to protected locations. If you take both of them together, it appears there's still, the town claims 42 percent or something like that of residences available to registrants. You say that's not enough because of various reasons, kind of various theoretical reasons, actually. What sort of, first of all, where is the line and how does the court go about drawing that line? So I think that where the district court went wrong was putting the focus on the availability of that 40 percent of housing. And there's a couple of reasons for that. First, I just think it's the wrong inquiry. There are plenty of restrictions that a municipality could enact. For example, no registrant can live within 6,500 feet of a member of the town board. That might still leave 40 percent of the town's housing in allowable zones, but it would still be necessary for this court to properly apply ex post facto analysis to look at the fit between the non-punitive objective being advanced and the restriction that the municipality decided to enact. So I think that the 40 percent standing alone doesn't tell you too much about whether this ordinance should be seen as imposing a punishment that violates the ex post facto clause. And the second reason that's really not appropriate, or it's not the principal measure that should be looked at, is that you have to look at the practical effects of an ordinance like this, which is that the town has creatively targeted the only rental housing it has. So by creating these floating restriction zones around registrants, it ensures that registrants will not be able to live there. Well, so let's take hypothetically, let's take subsection A, that floating protected zone, out of the picture. Let's just say the town only has a restriction that a registrant cannot live within 6,500 feet of a protected location. Right. And presumably that would leave more than 42 percent available, because I think that includes both provisions. In that case, in that situation, do you think that 50 percent would be enough? Is 60 percent enough? What percentage, what are the metrics that we're supposed to look at? So I think that what the court needs to examine is the relationship, the fit, the proportionality between the restriction that's being imposed and the interest that's being advanced. So in Vasquez, for example, this court looked at a 500-foot restriction and said there's a self-evident connection there. We don't want people who have offended against children living in very close proximity to places where children are known to gather. With the ordinance we've got at issue here, we're starting to take a few steps back from that, and the relationship between the public safety goal and the restriction imposed is getting more and more attenuated. Now we're looking at a mile and a quarter from these protected locations, and not all of the protected locations are child-centric locations, and not everyone who's subject to the ordinance is someone who's offended against a child. So really what I think the courts should be more sensitive to in these cases is the excessiveness factor of the Smith analysis, which requires for a little bit of a more searching inquiry into why this restriction has been enacted and what relationship it has to the articulated public safety goal. When you look, for example, at the restriction on individuals living within 6,500 feet of one another, the town has given a very theoretical, somewhat strained explanation of how this is going to advance public safety goals. It relies on a series of presumptions. If these individuals live within a mile and a quarter of one another, they may meet one another, they may form associations with one another, they may influence each other to act in antisocial ways. When you are relying on that string of assumptions or speculations, it starts to look like something that the court needs to take a closer look at the evidence underlying that restriction and whether it is proportional to the interest being advanced. I agree that I think that the appellant has a stronger case on the floating zones for a variety of reasons. But let's focus, for now, on your harder case, which is just the zones around protected locations. One of the things you offer in your briefs about why 42% is not sufficient, 42 or greater, is that Mr. Nelson would not be able to afford any of those tracts, right? But there is no information in the record as to, for example, what the average sex offender that would come into a municipality like Paris would be able to afford. Nor do we have any sort of demographic information with regard to incomes of other residents in the town, because certainly maybe other people can't afford those tracts as well, but then they have a large mortgage. And so I'm just trying to grapple with the broader notion of what sort of facts does a court like us need in order to make a determination under Smith as to whether or not buffers around protected locations would pass muster. It's certainly not easy, and there is a lack of clarity and lack of specificity in the Supreme Court's decisions about excessiveness. There isn't a clear test, and there isn't clear language for this. I think there are a few guideposts that a court analyzing one of these laws could look at. One is that the city has been frank about the fact that its purpose here was to target the only rental housing that is in the community. And it did that because the Wisconsin Department of Corrections had realized that these were affordable. But, again, my understanding is that those motels are not subject to subsection B. They're not within 6,500 feet of a protected location. And so, again, I understand why you want to go back to your stronger argument, but I want you to focus on the other one. And so should we look at the percentage of available housing? Should we look at economic factors? You know, we're supposed to look at these not as applied but on their face. And so as we do that, how do we go about this line drawing that you want us to do? So I think there are a few things the court can look at. One is these types of restrictions are not new. Communities have been enacting residency restrictions for over 30 years at this point. And the statewide restrictions range from 300 feet to 3,000 feet. That has been deemed by state lawmakers to be within the realm of what they've deemed necessary to advance their public safety goals. This is something that is far out of proportion with that. It's multiples higher than the restrictions imposed on state levels or by surrounding communities. So I think that's one thing the court can look at. The other thing is the basis the town is giving for this. It seems to reveal that this is an excessive regulation because their own witnesses said they had no basis to believe that 6,500 foot restrictions were more effective or did a better job advancing their public safety goals than 1,000 foot restricted zones. And in fact, they simply wanted to enact larger zones because 1,000 foot zones didn't bring enough within its purview. So I think those are the types of facts that the court can take into account when trying to analyze whether this is an excessive restriction in relation to the public safety goals that are being advanced here. What about the grandfathering clauses which make the ordinances less restrictive than those in Vasquez and Hope in some ways? How do we factor those in when we assess how restrictive this ordinance is? And my second question to you would be that the town tells us that 13 offenders have lived in Paris since the ordinance was passed. And is there anything in the record about why there are only three now? So I think grandfathering here has limited applicability to whether this ordinance is punitive on its face. And that's because it's no help for someone like Mr. Nelson who didn't establish his home prior to the enactment of this ordinance, didn't establish his home prior to the other registrant establishing a home within 500 feet of him. So I think that when you're looking at a facial challenge, the existence of those grandfathering provisions isn't all that relevant. And then with regard to there only being three individuals there now, it seems apparent that with these floating restriction zones, if you have three people, you're really putting the entire city off limits because there's two and a half miles around each of them within which another person cannot live. So even if somebody finds a residence that is within the allowable zones outside of the 6,500-foot exclusion zones, once they establish a home there, you're putting a floating buffer zone around them into which no other registrant can reside. But I still don't understand what happened to the 10 others. I mean, they were there, and now they're not. I do not know what happened to those individuals, and perhaps counsel for the town can answer that. But if it's okay, I'll reserve the remainder of my time. Thank you. Thank you. Mr. Wolfe? May it please the court, Attorney Dustin Wolfe for the town of Paris. I'll start just with some notes that I made during the previous argument. There was talk about that the ordinance is excessive because it hits places that aren't frequented by children. There is no factual basis for that. In the depositions, this is a really small town, and the way the ordinance was passed was everybody knows where kids associate. So one might be a church, but they know, hey, that church runs a daycare. So there's no factual support for the argument that just because it says a church or a library, that those aren't places that actually aren't frequented by children. Along similar lines, one of the reasons for the distance that was chosen is the rural nature of the town. And I know not every rural town has chosen to go with that size of a distance, but there was testimony that there was a concern that kids will go in groups unsupervised by parents to a place that's a protected zone by themselves. So there was a concern that something could happen along the way, which was one reason for the larger buffer. Mr. Wolfe, one of the peculiar aspects of the ordinance to me is this notion of what is referred to as floating buffer zones. At some point in time, given the 6,500-feet buffer zone that's required around a registrant once he or she moves in, at some point, I don't know if the town has done this analysis or not, there's just not going to be any residences available effectively, and that would, under our cases, effectively amount to banishment because if you're a registered sex offender and you want to live there, there's just no place for you to live. Now, perhaps if a couple of those people move out, there is, but at some point the ordinance envisions a time when they simply will not allow any registrants to live in the town. And so why isn't that banishment and why isn't that something that we should consider in assessing whether or not at least that section of the ordinance, Section A, passes constitutional muster? Sure. That's an interesting question. Right now it's a theoretical possibility. No, no, but we have to look at the ordinance on its face. And so we look at when we do this analysis, the way I do this analysis is I look at the ordinance at both extremes. I look at what does the ordinance permit and also what does it kind of allow in its extremes. And certainly on its face, it allows for this kind of scenario to take place, whether it's in a year or two years or what have you, where the town is simply off limits to anyone. And I guess the cleanest answer to that is the appeal procedure. And that was added specifically in 2018 to give more flexibility and individualized assessment available to designated offenders. And that was one of the factors in the reply brief. Council said, well, that's not a factor that goes to the risk of the designated offender, but it's the other. It's the burden, right, if we're going to balance. Available housing is one of the factors. So if it came to a place where the bubbles were such that there was, you know, every place was off limits and somebody wanted to move in, that's a factor that can be taken into account for the appeal. And at that point, they might say, you know what, that's, you know, assuming that there wasn't a high risk, that would weigh in factor of allowing somebody to live. So let's say a hypothetical town passes an ordinance that says, you know what, registered sex offenders are not allowed to live in this town unless they go through a hearing process, right. Do you think such an ordinance would be permissible? It would certainly stand worse than ours does. But I guess that's not my question. My question is do you think that that would be permissible under the ex post facto clause? You would have to go through each of the factors. I think it would probably pass muster because it says, I mean, it doesn't relate to a traditional means of punishing, right. And ours is regulations that say where you can live and then there's some flexibility built in. I thought it was really interesting that the Supreme Court said the reason that this is a factor is because if a town passes a law like this, they want to tell everybody that what we're doing is punishing. So they're going to pick something that looks like punishment. The law you mentioned where it says nobody can come in and there's a back door that you can do, that sounds a lot more like we don't want people in. So here ours is in a better stead than that. So I think if you were to have a flat-out ban and say, but there's exceptions, that signals, hey, we're trying to punish. But isn't that what will happen at some point under the current ordinance? There will be a flat-out ban. And what you're saying is they can get exceptions by going through the appeals process. I think part of it is that I know we're looking at the possibilities of what could happen. The law has been in effect since 2008. It hasn't happened yet. And the question is where are those people? There have been 13 that have lived here. Currently there are only three. So it hasn't happened yet. The town hasn't been faced with that possibility. And quite frankly, if they had been faced with that issue, they might very well have said, oh, let's have a different buffer. I think they probably just picked the same buffer that they had for the protected places. I do not understand your argument about the appeal process. Because what would the appeal process do to save the ordinance if, in fact, it may be unconstitutional? The appeal process puts the outcome in the hands of members of the town board who can assess myriad factors, including extremely objective ones, like level of remorse, credibility of the offender, current dangerousness. I don't understand how an offender could ever win an appeal process where this kind of subjectivity could easily mask a true intent to just keep former offenders out of Paris. And there were 13, and now there are three. So I'll ask you the same question. Where are the other 10 now? Yeah, thank you. Starting with the first issue, the appeal process, I mean, it's interesting that it hasn't been tested here. In this case, there's a provision for certiorari review. And the factors all do relate to things in determining, in a particularized manner, what the risk is for a particular offender. And that was, you know, certiorari review, one of the big ones, is if the board exercised its will instead of its judgment. Here, they all factored in. Mr. Nelson had committed parole violations. He had firearms violations. He was living without following the law to register for two years. So there were all, you know, good reasons. Mr. Nelson or anybody could challenge that if somebody just said, if the board, you know, just said, we're going to do it, we don't like you or whatever. They couldn't come up with anything that factors into, you know, it's required to look at the risk that the person poses. So I think that it's not just window dressing. There's the certiorari review. And it hasn't been tested yet. We put that in to add flexibility and escape valve. If we had facts that suggested, you know, there was a bunch of appeals and all of them got rejected for reasons that seemed frivolous, then you could say, yeah, that's a dead letter. It's just window dressing. It's toothless. There's no evidence here that the appeal is toothless. Mr. Nelson was the first person, the only person that's ever been cited under the ordinance. You know, there's these arguments that people can't find places to live in the whole area because everybody has similar ordinances. Mr. Nelson is the first person who wasn't able to find another place to live when he was notified that he was living in violation of the, of the ordinance. Let me ask you this, because this has been, what happens if a sex offender is lawfully living somewhere and another offender moves within 6,500 feet under that exception that allows offenders to move into the residence of a family member who's been living there for at least two years. Does the first offender have to move or the second one, or can they go stay? What's the situation with that? I think there's a hyper-technical reading of the statute that would, that would require the first person to move. I don't think that was the intent. And under the idea that statute started to be interpreted so as to preserve their constitutionality. I think that that person would be allowed to stay and it's never, you know, it's never, it's never happened. And if we assumed that every house in the town was vacant and available for purchase, how many sex offenders could the town accommodate under these ordinances? I don't know how, I don't know how many. I haven't done that. And that's the factual record that went on in summary judgment was not all the permutations. You know, we did the facts as to currently what was available but it was not looked at that closely. But I assume that a sex offender could live just outside the border of Paris and live just a few feet from a daycare facility that is on the Paris side of that border. And I was wondering what you thought, what effect that would have on the rational basis for the ordinance. Yeah. I mean, I guess that's one of the, one of the issues with the fact that, you know, you've got multiple municipalities, one municipality can't control everything. So you might have an instance where you can't tell somebody you can't live right across the border, even though it's near a school where your kids are going to be going to school. And then, you know, the whole idea with that is, you know, we're not looking at the perfect law, you know, it doesn't violate due process because it's not perfect, but there's a rational relationship. And is protection of children, the only stated rationale for the ordinance. In other words, did the town ever have any rationale that connected sex offenders whose victims were adults to the threat to children? If you look at the stated purpose in the ordinance itself, children protecting children, I believe is the only stated purpose under the idea that we can come up with post-hoc rationalizations to preserve the constitutionality of the law. Quite frankly, I considered other rationales behind that that weren't listed in the statute. So it does Dr. Savard had testimony that would suggest it would protect adults from being sexually molested and it would have other, you know, other effects. I mean, one thing that I argued, and it's, I think it's a little bit in the materials. It was one of the four things that were read and relied on. There's an idea of fairness in, in clustering, right? It's not fair for, you know, one, if you live near the Bristol motel or the Oasis to have all of, all of these dangerous people. And now that's a legislative fact that there is a danger of recidivism. We got to take that as a given. It's really not fair to have all of those clustered in certain areas. So one part of society is bearing the brunt of that danger. So the, the anti-clustering will help spread that out to, to spread the risk. And also you don't, you don't get these hot zones, you know, and the idea, it goes with what Dr. Savard was saying as to, you know, like-minded people gathering together might be more inclined to commit crimes. So that's another. That's actually what the empirical evidence has been showing. And although of course it's true that legislatures don't need to rely on empirical evidence when they legislate, can they ignore empirical evidence that demonstrates that their legislation doesn't have the effect that the legislation was drafted to have? I think it goes too far to say that this has been proven. And I think a key thing out here, and it got me when, when John Holloway, the chairman was testifying, they're faced with the fact that 70% of these offenses go unreported up to 70%. Different studies have different numbers. So we really don't know. There could be several sex offenses against children every year. And we don't know. We could have a law that is does a good job of reducing the amount. And we might never know given the fact that this is such a horrible thing to And faced with this lack of data legislative body is entitled to be cautious and to say, you know what, we just want to make sure. So I don't think it's been proven that they never work. I think, I don't, I think it's impossible to prove. And as this court has pointed out, it's not the job of the courts to sift through the most recent social science data to figure out what is the best law. I think the line drawing is a problem. I don't know. Are you going to tell us that you can have a 3000 foot? You have to keep a certain amount open. That's for legislatures. And I think here it hasn't reached the point in its effects and its probable effects that it says, you know what the town is not trying to protect its children. It's trying to punish people because of what they did in the past. That just doesn't appear from this record. Thank you. Well, many programs, of course, house sex offenders together. Evidence demonstrates that giving sex offenders in putting them in more stable housing opportunities leads to less recidivism. Housing sex offenders together and makes it easier for those who want to keep an eye on them. And our current understanding is that sex offenders are not more likely to be convicted of committing any other crimes. So is that next where anyone who, you know, has served their time served and encompassed to live in, in Paris? Well, is that the next step for you? I would just point out, I'm sorry. I talked over you. I would just point out that those studies that say that there is actually a beneficial effect to group homes. Those are people that are under the active supervision of the department of corrections. And in that aspect, they found it was beneficial. The town doesn't have those resources and it's not, we're not doing parole. We're not actively looking at every aspect of the lies. So we just want to protect them through the, through the zoning. I'm sorry. I forgot what the last part of your question. I'm sorry. Are you done? Was there another question? I, I, I just am. I mean, no other locality has created such an ordinance. So of course we have no case law supporting the conclusion that, you know, that you have put forward. And just in response to that, my first point was going to be, I think it's a legislative fact. The United States Supreme court has said that this is a high risk of recidivism and these are rational measures in general. I think municipalities should be entitled to rely upon that and setting in place. And again, I forgot the second point, Mr. Well, going back to your, what you said about clustering, you know, we read the statute and we have to take the stat, we have to take the legislature for what it says or the town for what it says in the statute, which is the goal of the statute is to provide better protection for children by minimizing immediate access and proximate proximity to children. Can you point to me, to where in the record does anyone from the town tie the requirement that sex offenders not live one another to that purpose, the purpose of protecting children as stated in the statute? Cause I looked through chairman Holloway's deposition. I looked through the record and I can't find any place where anyone from the town said that the reason why they needed the, the proximity to other sex offenders provision was to safeguard and protect children. I think there is something in the record in the depositions about a fear that these hotels, these motels where people can travel and have their kids that can you, can you, do you remember where it was? Cause I, I wasn't able to find it. I don't know if it got into the proposed facts, but I remember, I remember after the deposition thinking, I'm going to think twice about going to motels. So there, there was, there was something there about the idea that it would be dangerous for children who are traveling with their parents to go to hotels if they were full of convicted sex offenders. I'm sorry. I cannot remember. It might've been the clerk. I can't remember exactly whose testimony that was. Okay. Thank you. Thank you. May I just ask, I'm sorry, but I know I'm obsessed with this number 13. Would the record tell us if all 13 were there at once or if they sort of floated through or? I don't know if the record will tell you. I can remember, I got that number in putting together responses to discovery, identifying sex offenders that have lived in the town. I don't believe they were all there at once. And it's a matter of public record. Actually, I don't know if you could track, I mean, we, I could find out where they are now by looking them up because they're registered sex offenders. So we can find out where they are. My recollection is that many of them moved into neighboring municipalities. They sort of, people view that whole area as sort of a metropolitan area and move freely among them. I think that's what happened to most of them. Okay. Thank you so much. Thank you. All right. Thank you. Ms. Nicholas. Thank you. I want to address what council said regarding the appeals board. I think it's extremely problematic to argue that towns are operating as kingdoms that can decide who can live there and who can't. As was pointed out, there are extremely subjective factors here that have almost nothing to do with risk. And that's exactly what happened to Mr. Nelson is that the town decided, well, he could go somewhere else. He had the wherewithal to afford another residence and therefore we're not going to let him live in our town. Pardon. And it's, it's simply that kind of power can't be put in the hands of town boards. This is not an individualized risk assessment of the type that was cited favorably by the eighth circuit in weems. This is simply giving discretion to local officials to decide who can live there as a matter of ex post facto law. Pardon? Are you making a point about ex post facto law or some other source of law for this rule you're proposing about municipal officials categorically not having that discretion? Well, certainly, I mean there's lots of zoning codes that dictate where people can live and where they can't live where people can live, but Holt keeping people out of a whole town based on local officials analysis of whether they can afford to live somewhere else seems to be giving those officials the ability to impose unconstitutional except that overlooks that there's 41% of the housing stock in Paris that remains available to your client. Well, um, I think as a practical reality, 41% is not available. Um, the district court correctly pointed out that there were some parts of the town and 41% was the figure that was there, but there is a high rate of ownership in this town. So these properties, even if affordable were not available for purchase and the town has made clear that its purpose in enacting this ordinance was to target the only rental properties that are in the town. Um, and I guess I just also want to point out that this isn't a generally applicable zoning law. Um, this isn't saying no longterm rentals in the hotels, no registrants. Understood. But I was, you made a very categorical statement about what the town can and can't do. And, and, um, I don't know the source of law supporting that statement as a matter of ex post facto law, a matter of due process law, some other source of law. Well, yes. I mean, I, I think that, um, it would implicate both. Um, one it was, we have an ordinance that is so excessive in relation to the non punitive purposes that have been articulated by the town that, um, we can't have the town just enforcing that at their sole discretion. Um, but that's a, that's a very low bar as the Supreme court has defined it. It's not like narrow tailoring for purposes of tiers of scrutiny for heightened review in first amendment cases. For example, it's rational basis review basically. Well, I, I want to push back on that. Um, because while the court did say, you don't have to have a perfect fit and you don't have to choose the least restrictive alternative. You do have to have restrictions that are reasonable in light of their non punitive objective. Now that is a little open ended. And I will admit that the courts have not been completely clear about what that means, but it is something more than rational basis review. Otherwise that factor wouldn't exist. It would just be, is it rationally related to a non punitive purpose? And that would end the inquiry. But there is that other factor in there that looks at the excessiveness and that has to be given some force, but it's just basically a test for sham rationales. Um, right. I disagree with that. Um, I think that's what the Supreme court, how the Supreme court characterized it. That's the fourth factor, whether it has a rational relation to a non punitive purpose. And then once you get over that and show it's not a sham, then you have to look a little bit more closely at, um, whether it is excessive in relation to those purposes. So, um, I see I'm out of time. So for these reasons, we'll ask that you reverse the district court. Thank you very much. Our thanks to both counsel. The case has taken under advisement and the court will take a 10 minute recess before we call the next case.